IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Clarence Tullius, | : | |
| Plaintiff | : | Case No. 2:10-cv-00455 |
| v. | : | Judge Graham |
| Michael J. Astrue, Commissioner of Social Security, | : | Magistrate Judge |
| Defendant | : | |
| | : | |

**ORDER**

This matter is before the Court on plaintiff Clarence Tullius's January 24, 2011 objections (doc. 14) to Magistrate Judge Abel's January 12, 2011 Report and Recommendation (doc. 13).  The Court, having reviewed the record *de novo*, determines that there is substantial evidence supporting the administrative law judge's determination that plaintiff Tullius is not disabled within the meaning of the Act.  The Court further finds for the reasons set out below that plaintiff's objections to the Report and Recommendation are without merit.

Plaintiff Clarence Tullius applied for Social Security disability insurance benefits alleging that he became disabled in April 2002, at age 34, by a learning disability, speech difficulty, and a broken tailbone. The administrative law judge found that Tullius had the severe impairment of borderline intellectual functioning, but that he could perform routine, repetitive tasks. He concluded that Tullius retained the ability to perform his past work as a fast wood worker, a job that he had performed for 17 years.

Plaintiff argues that the Commissioner erred in finding that the medical evidence does not meet or equal Listing 12.05(c). Specifically, plaintiff argues that Tullius had a full scale IQ score of 67 when he was 12 years old; and the Listing 12.05(c) provide that if there is more than one IQ score, the lowest IQ score should be used.

The Report and Recommendation fairly summarizes the evidence regarding plaintiff's mental impairment:

> **Psychological Impairments.**
>
> An April 1985 Warren Local School District special education re-evaluation report indicates that in the seventh grade plaintiff's IQ, as measured by the WISC-R, was 67. In the ninth grade, his IQ, as measured by the Stanford-Binet test, was 77. (R. 114.) In April 1985, Tullius had a chronological age of 18 but a mental age of 12. His IQ of 72 placed him in the 4th percentile in the developmentally handicapped range of intellectual functioning. His Beer Visual-Motor Test scores placed him as age 9-11, "indica[ting] significant disabilities of visual-motor development." (R. 115.) On the Peabody Picture Vocabulary Test his receptive language skills scored a mental age of 13-1. His WRAT scores were grade 4.1 for basic reading, grade 3.0 for spelling, and grade 4.6 for math. Plaintiff's Vineland Social Maturity Scale score was at the 11.7 age equivalent, and his social quotient was 64. These score suggested deficits in communication and occupation. *Id.*
>
> In May 2003, at the request of the Ohio Bureau of Disability Determination, Rod McCullough, a licensed psychologist, performed a psychological examination of Clarence Tullius, who was then age 36. (R. 164-68.) Tullius drove himself to the examination. (R. 164.) He had no impairment of mood or affect. He did not display anxiety or psychotic symptoms. He was alert and oriented. He attended to tasks well and was able to complete simple commands. Overall, his cognitive skills were below average. He denied any impairment in his ability to care for himself. (R. 166.)
>
> WAIS-III testing showed a verbal IQ of 75, a performance IQ of 77, and a full scale IQ of 74. McCullough stated that the scores were a valid intellectual assessment. (R. 166.) They placed plaintiff in the borderline range of intellectual functioning. His WRAT reading and spelling scores were at the grade 2 level. (R. 167.) His WMS-III memory functioning scores

were significantly better and showed no impairment in memory procession. (R. 167-68.) McCullough found Tullius's ability to interact with others was not impaired. His memory processes were average. Intellectually, he functioned in the borderline range. Plaintiff would have significant difficulty completing detailed and complex tasks. He could maintain attention and concentration, and his level of persistence and pace was adequate. Plaintiff could adjust to work-related stresses. (R. 168.)

In 2003, Dr. Tony R. Goudy, a psychologist, reviewed plaintiff's records and his mental limitations. (R. 198-200.) Dr. Goudy felt Tullius had mild mental retardation, and that he met Listing 12.05C. (R. 199.) Plaintiff had a valid IQ of 60 to 70, and a physical or other mental impairment imposing additional insignificant work-related limitation of function. (R. 199.)

On June 8, 2005, Dr. Gary S. Sarver, a psychologist, examined Tullius. Plaintiff had always lived with his parents, but participated in shopping, bill paying and household management. (R. 323.) He played baseball, cooked, washed dishes, did laundry, shopped, paid bills, and drove. (R. 324.) Plaintiff said he did average academically in LD classes and did not fail any grades. (R. 323.) He denied having depression, suicidal ideation, hallucinations, and delusions. Plaintiff was pleasant and cooperative. His mood was unremarkable, and his affect was appropriate. He did not exhibit any signs of anxiety. His speech and language were normal, informative, relevant, and coherent. (R. 324.)

Cognitively, he had adequate reality contact, and he had no difficulty with attention, pace or persistence. (R. 324-25.) His thought mechanisms were intact, and he had no looseness of associations or flight of ideas. His stream of thought was appropriate and without circumstantial thinking, obsessions, or compulsions. Tullius was able to remember three words immediately and after a five minute delay. He could remember four digits forward and reversed. He was alert and oriented. His memory was intact. His abilities to read and write were in the mentally retarded range. Abstract reasoning and judgment were in the borderline range.  He exhibited poor insight. (R. 325.)

WAIS-III testing revealed a verbal IQ of 79, a performance IQ of 75, and a full scale IQ of 75, scores that are in the borderline range of intellectual functioning. (R. 325-27.) His verbal comprehension was in the 9th percentile. His math ability and general fund of knowledge were within the average range. His vocabulary skills were within the low average range. His abstract reasoning, memory and attention were within the borderline range. (R. 326.) Dr. Sarver concluded that plaintiff's ability to relate to others was minimally limited. His ability to understand and follow simple one and two-step job instructions was mildly limited; his

>ability to maintain attention and perform simple, repetitive tasks was minimally limited; and his ability to manage daily work stresses was mildly limited. He was diagnosed with borderline intellectual functioning. (R. 327.)
>
>In July 2005, Dr. J. Williams, a state agency psychologist, reviewed Plaintiff's medical record. (R. 427.) Dr. Williams concluded that plaintiff had mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 419.) Plaintiff could perform simple repetitive tasks, but he was limited in his ability to perform complex or detailed instructions or do jobs that require reading skills above the third grade level or math skills above the sixth grade level. (R. 427.)

(Doc. 13, Page ID# 73-76.) The Magistrate Judge further held that based on this record, there was substantial evidence supporting the Commissioner's decision denying benefits:

>There is substantial evidence in the record supporting the administrative law judge's credibility determination and his finding that plaintiff Tullius does not meet or equal Listing 12.05. He does not meet the Listing because there is no valid IQ score between 60 and 70, there is substantial evidence that he did not suffer from deficits in adaptive functioning during the developmental period that satisfied the Listing 12.05C criteria, and there is substantial evidence supporting the administrative law judge's finding that he does not have a physical or other mental impairment that imposes an additional and significant work-related limitation of function. Although plaintiff Tullius has functioned in the borderline range of intelligence, his mental limitations did not prevent him from working at McDonald's for 17 years.
>
>Mr. McCullough, a licensed psychologist, found that Tullius was functioning in the borderline range of intelligence and could perform routine, repetitive tasks. (R. 324-25.) Dr. Sarver also found that plaintiff was functioning in the borderline range of intelligence. He had the ability to perform simple, repetitive tasks. (R. 327.) Dr. J. Williams, a state agency psychologist, reviewed the record and concluded that Tullius could do simple, repetitive tasks. (R. 427.)
>
>Although Tullius has experienced at least one episode of acute back pain, there is no evidence of any significant limitation imposed by an impairment to his back. He is able to get on and off an examination table

> without difficulty. He can squat and walk on his heels and toes. (R. 171.) The range of motion in his lumbar spine is normal. There is no muscle weakness or atrophy. There are no sensory deficits. (R. 171-75, 330, 345 and 352.) Straight leg raising has been negative. (R. 352.) Examining physicians found no significant limitations from a back impairment. (R. 171.) In the one documented attack of acute lumbar spine pain, Tullius recovered quickly with physical therapy. (R. 343 and 345.) Although his blood sugar is apparently poorly controlled (R. 480), there is no medical evidence of resulting limitations. Indeed, as defendant argues, there is evidence that Tullius shops, drives, played baseball, cooks, cleans, does dishes, does the laundry, irons, shops, pays bills, cuts the grass, fishes, walks a couple of miles a day, cares for pets, and plays pool.

(Doc. 13, Page ID# 81-83.)

> Listing 12.05C provides:
>
> > 12.05 *Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> >
> > The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> >
> > . . .
> >
> > C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

The requirements for intelligence tests are discussed in Listing 12.00D(6):

> 6. *Intelligence tests.*
>
> a. The results of standardized intelligence tests may provide data that help verify the presence of mental retardation or organic mental disorder, as well as the extent of any compromise in cognitive functioning. However, since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation.
>
> b. Standardized intelligence test results are essential to the adjudication of all cases of mental retardation that are not covered under the provisions of

> 12.05A. Listing 12.05A may be the basis for adjudicating cases where the results of standardized intelligence tests are unavailable, *e.g.*, where your condition precludes formal standardized testing.
>
> c. Due to such factors as differing means and standard deviations, identical IQ scores obtained from different tests do not always reflect a similar degree of intellectual functioning. The IQ scores in 12.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15; *e.g.*, the Wechsler series. IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores. In cases where more than one IQ is customarily derived from the test administered, *e.g.*, where verbal, performance, and full scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05.
>
> d. Generally, it is preferable to use IQ measures that are wide in scope and include items that test both verbal and performance abilities. However, in special circumstances, such as the assessment of individuals with sensory, motor, or communication abnormalities, or those whose culture and background are not principally English-speaking, measures such as the Test of Nonverbal Intelligence, Third Edition (TONI-3), Leiter International Performance Scale-Revised (Leiter-R), or Peabody Picture Vocabulary Test—Third Edition (PPVT-III) may be used.
>
> e. We may consider exceptions to formal standardized psychological testing when an individual qualified by training and experience to perform such an evaluation is not available, or in cases where appropriate standardized measures for your social, linguistic, and cultural background are not available. In these cases, the best indicator of severity is often the level of adaptive functioning and how you perform activities of daily living and social functioning.

Contrary to plaintiff's argument, the Listing does not direct the Commissioner to rely on the lowest IQ score from any test ever administered. Rather, it encourages the use of standardized tests that measure verbal, performance, and full scale IQs. When all three are measured, then Listing 12.05C uses the lowest of the verbal, performance and full scale scores. Further, the IQ scores alone are not determinative. The goal of the testing is to determine the presence of mental retardation. And "since the results of

intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." Listing 12.00D(6)(a). Finally, Listing 12.05C itself requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."

Here there is substantial evidence supporting the administrative law judge's determination that Tullius did not have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Indeed, Tullius was gainfully employed for 17 years. Moreover, there is no documentation of the WISC-R score of 67 other than a later notation in an April 1985 Warren Local School District special education re-evaluation report. This lone IQ score between 60 and 70 was when plaintiff was 12 years old. All the other school age and adult IQ scores were above 70. Consequently, there is substantial evidence supporting the administrative law judge's decision that plaintiff does not meet or equal Listing 12.05C.

Upon *de novo* review in accordance with the provisions of 28 U.S.C. §636(b)(1)(B), the Court **ADOPTS** the Report and Recommendation. Plaintiff's motion for summary judgment is **DENIED.** Defendant's motion for summary judgment is **GRANTED.** The

7

decision of the Commissioner is **AFFIRMED.**  The Clerk of Court is **DIRECTED** to enter **JUDGMENT** for defendant.  This action is hereby **DISMISSED.**

    It is so ORDERED.

                                                  s/ James L. Graham
                                                  JAMES L. GRAHAM
                                                  United States District Judge

DATE: March 2, 2011